Filed 12/6/24  In re E.H. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| In re E.H., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>D.H.,<br><br>    Defendant and Appellant. | E082345<br><br>(Super.Ct.No. DPRI2300144)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Mona M. Nemat, Judge. Affirmed.

Arthur J. LaCilento for Defendant and Appellant.

Minh C. Tran, County Counsel, and Prabhath Shettigar, Deputy County Counsel, for Plaintiff and Respondent.

1

# I. INTRODUCTION

Appellant D.H. (Father) is the father of E.H. Father appeals from the October 4, 2023 jurisdictional findings and dispositional orders, adjudicating E.H. a dependent of the juvenile court and removing E.H. from Father's care. (Welf. & Inst. Code, §§ 300, 361, 395.)[1] Father claims: (1) insufficient evidence supports the court's jurisdictional findings that Father had sexually abused E.H., and there was a substantial risk Father would continue to sexually abuse E.H. (§ 300, subds. (b)(1), (d)), (2) the court abused its discretion in removing E.H. from Father's care, and (3) the court denied Father due process in excluding evidence at the jurisdictional and disposition hearing. We find no merit to these claims and affirm the challenged orders.

# II. FACTS AND PROCEDURE

A. *Background*

E.H. was born in May 2010. From January 2011 to February 2023, Father and E.H.'s mother, C.C. (Mother),[2] engaged in extensive family court litigation over custody of E.H. and allegations that Father sexually abused E.H. Between March 2013 and June 2019, respondent Department of Public Social Services (DPSS) received several referrals alleging Father sexually abused E.H., and found the referrals either unfounded or inconclusive.

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

[2] Mother is not a party to this appeal.

The family court also investigated the sexual abuse allegations against Father and did not credit them. From and after January 2011, the parents generally shared joint legal and physical custody of E.H. Most recently, a family court judgment, signed on February 16, 2023, awarded the parents joint legal custody of E.H. and established a timeshare schedule. Under this schedule, E.H. was with Father four weekends each month and three weekdays each week, from after school until 7:00 p.m.

On April 25, 2023, DPSS received a referral alleging general neglect and sexual abuse of E.H. by Father. "It was reported that multiple people had shared . . . what they believed was inappropriate physical contact between the father [and child]. [Father] had been observed plac[ing] his hands on [the child's] body, near her breasts, waist and groin area on top of her clothing. Another individual observed an excessive level of affection between [the two], stating they are 'clingy' and look like they are on a date." On April 26, a social worker and law enforcement officers went to Father's home to speak with Father and E.H. about the referral. Father would not permit the social worker and officers to enter the home but allowed the social worker to speak to E.H. at the doorway. E.H. said she felt safe at home, she was not afraid of anyone, and she denied anyone had touched her "private parts."

Later on April 26, 2023, the social worker received a phone call from "a collateral party" (not Mother) who was "familiar with" the family and reported seeing Father inappropriately touching E.H. "for a few months now." This party said E.H. was " 'glued' " to Father "during [church] services" and did not engage with other children or adults. E.H. would sit "right next to" Father, lay her head on his chest, put one hand on

3

the upper part of his back, and "wrap the other around his chest," while Father would "plac[e] his hands on [E.H.'s] waist or near her breasts."

On April 27, 2023, the social worker learned that police had interviewed E.H. at her school on April 26 and planned to close the report as unfounded because E.H. did not disclose any sexual abuse by Father. E.H. told the police her paternal grandfather would know if anything were happening between her and Father. Later on April 27, the social worker interviewed E.H. at her school. When asked whether she knew which parts of her body were "private," E.H. answered, " 'My dad hasn't touched me.' " When asked if anyone had ever asked her to keep a secret, E.H. said Father had asked her not to tell Mother that E.H. and Father were sleeping in the same bed. E.H. clarified that she was nine years old when she last slept in Father's bed, and nothing inappropriate had happened.

Soon after the social worker left E.H.'s school, Father called DPSS, saying he was upset that both DPSS and the police had interviewed E.H. The social worker then called Father and explained that allegations had been made that Father had been inappropriately touching E.H. When asked whether he had touched E.H. near her breast, waist, or groin area, Father said, " 'No, that is gross.' " Father told the social worker that speaking with E.H. about the allegations was "on the verge of abuse" because E.H. had been vomiting and upset since the social worker spoke with her. The social worker then spoke with Mother, who said she had "concerns" about E.H. in Father's care and had, "in the past," reported what E.H. told Mother about Father inappropriately touching her. Mother said

4

E.H. was nine years old the last time E.H. disclosed that Father was inappropriate with her.

The next day, April 28, 2023, Mother disclosed that, on the night of April 27, E.H. told Mother that E.H. was upset because she had been questioned about Father "again." When Mother told E.H. that "people were concerned for her due to reports of inappropriate touching," E.H. said, "How would they know that? Were they in our house?" When asked what she meant, E.H. said, " 'Don't worry about it, mom. It hasn't happened in two months. He hasn't done anything in two months.' " E.H. then "became very upset, shut down, and went into her room." Mother was worried because E.H would return to Father's care on Monday, May 1.

E.H. participated in a forensic interview on April 28, 2023. During the interview, E.H. said she would sit on Father's knee while watching television, and Father would pull her back toward him with his arms around her stomach, but clarified that Father did not want her to feel uncomfortable and would place his hands on her shoulders. E.H. also said she would " 'cuddle' " with Father while watching television, meaning they would lie on the couch facing each other, and the one with his or her back to the television would turn his or her head toward the television. E.H. also said that, when she was nine years old, she would sleep in Father's bed, but it was " 'normal.' " At the time, Father asked E.H. not to tell Mother they were sleeping in the same bed. When asked whether Father ever touched her inappropriately, E.H. said, " 'I don't think so' "; and when asked what she meant, E.H. said, " 'It means if it did, I don't remember.' "

On May 1, 2023, DPSS notified the parents that DPSS intended to file a section 300 petition for E.H. and that a detention hearing would be held on May 4, 2023. Father declined referrals for parenting, counseling, and mental health services. On May 1, E.H. was detained from Father, but not Mother, pursuant to a protective custody warrant. On May 3, DPSS filed a section 300 petition, alleging E.H. came within section 300, subdivisions (b)(1) [failure to protect] and (d) [sexual abuse].

At the detention hearing on May 4, 2023, the trial court detained E.H. from Father and left E.H. in Mother's temporary custody. Counsel for E.H. was appointed E.H.'s guardian ad litem. The court found DPSS made a prima facie showing that E.H. came within section 300, subdivisions (b)(1) and (d), and detention from Father was necessary. The court authorized supervised visits for Father in a therapeutic setting and an immediate therapy referral for E.H. The court also issued a "no discussion" order, directing anyone who was around E.H., including the parents, not to discuss the case with E.H.

B. *The Prior Allegations of Father's Sexual Abuse of E.H. (2013 to 2019)*

DPSS's May 3, 2023 detention report and May 26 jurisdiction and disposition report include detailed narratives of sexual abuse allegations against Father, made between March 2013 and June 2019, which DPSS determined were unfounded or inconclusive. In the following subsections, we summarize the 2013 to 2019 sexual abuse allegations against Father, in order to provide context to the current allegations and jurisdictional findings against Father.

### 1. March 25, 2013 / E.H. Discloses Holding Father's "Peepee"

DPSS received its first referral alleging Father sexually abused E.H. on March 25, 2013. DPSS was concerned that Father was not covering himself when E.H., then age two, would walk into the bathroom when Father was using it. That day, E.H. said the word "peepee," and when asked whether she had seen Father's " 'peepee,' " E.H. said, " 'I touch boys' "peepees." ' " E.H. also said she "holds" Father's " 'peepee' in her fingers." Mother " 'went off' " on Father about it being in appropriate for E.H. to see Father's penis. Father said E.H. had "walked in on him again" but he believed it was "natural" for E.H. to see Father naked. It was also reported that E.H. slept in Father's bed when E.H. spent the night with Father.

Around April 2013, Father's visits with E.H. were suspended for six months while Father was being investigated for sexually abusing E.H. Father's visits resumed on October 4, 2013. In November 2013, Mother reported E.H. would cry, " 'I need you. I need you. I need you,' " every time Father returned E.H. to Mother, and E.H. did not want to return to Father. But E.H. did the same thing when taken to her maternal grandmother. It was believed E.H.'s behavior was due to E.H. not having seen Father for six months.

### 2. August 14, 2014 / Showering Naked with Father

On August 14, 2014, Mother reported that E.H., then age four, told Mother that, since December 2013, E.H. had showered with Father two to three times while they were both naked. Mother reported telling Father she did not feel comfortable with Father

showering naked with E.H., but Father said it was healthy for E.H. to be exposed to his nudity.

3. <u>November 5, 2014 / Redness Around E.H.'s Vaginal Area</u>

On November 5, 2014, E.H. was brought to an emergency room due to redness around her vaginal area. Mother tried diaper cream for the redness, but it did not improve; and Mother reported the redness was worse when E.H. returned from being with Father. Father refused to be interviewed. In a forensic interview, E.H. did not disclose any sexual abuse by Father. From November 6, 2014 through December 1, 2014, DPSS received five "secondary" referrals with the same or similar allegations as the "primary" November 5 referral.

4. <u>December 1, 2015 / Reports of Showering Naked with Father</u>

On December 1, 2015, Mother reported that E.H. said E.H. and Father showered together, that E.H. had seen Father's private parts, and that Father made E.H. "wash him" when they showered together. E.H. also said Father took pictures of E.H. and made E.H. take pictures of him, but it was unclear whether E.H. or Father were naked when the alleged pictures were taken. E.H. said she told Father she did not want to shower with him. In December 2015, the parents were involved in a "custody battle" for E.H., and Mother had a domestic violence restraining order (DVRO) against Father.

5. <u>March 4, 2016 / Further Reports of Showering Naked with Father</u>

On March 4, 2016, it was reported that E.H. was having "memory flashbacks of sexual abuse" by Father. E.H. said Father would "make her take showers with him and make her wash his privates." E.H. would tell Father to stop but he would not stop and

8

would "mak[e] her do it anyway." E.H. also said that Father would make E.H. "touch his privates," and E.H. saw " 'stuff come out of his belly button.' " E.H. was able to describe the male anatomy. E.H. also said Father would take pictures of E.H. in the shower. Father had the pictures of E.H. on his computer, which he kept locked in his car. Father's home was searched, and a different computer was confiscated. E.H. was described as "absolutely terrified" of going with Father on weekends and "begging" for someone to help her.

E.H. said Father had threatened her that if she told anyone "again" he would be "in big trouble" and would go to jail. During the investigation of the March 4, 2016 referral, E.H. said she told Mother she was afraid Father might "do all those bad things to her again," but she was "really little" and she did not recall what those bad things were. DPSS concluded the referral was "inconclusive." In May to September 2016, the parents were still sharing physical custody of E.H., and E.H. was visiting Father on weekends.

6. <u>June 14, 2019 / Father Pulled E.H.'s Pants and Underwear Down</u>

On June 14, 2019, E.H. disclosed that, during her last visit with Father, she awoke to Father pulling her pants and underwear down. Father explained to E.H. that he wanted to check for a bruise on her bottom that he had seen. E.H. said this was not possible as she was not wearing see-through clothing that would expose such an injury. E.H. also said Father told E.H. not to tell Mother that Father and E.H. had been sleeping in the same bed. E.H. wrote in her journal about some of the incidents that occurred with Father. One journal entry read, " 'You lied to me. She knows the truth. I better make her forget.' " Another read, " 'My dad told me not to tell my mother that we sleep

9

together. I remember taking showers with dad once a weekend. I can't remember if he was wearing a bathing suit or not.' "

During the investigation of the June 14, 2019 referral, E.H. explained that she was sleeping on one side of the bed when, without warning, Father pulled her pants down and she felt afraid because she did not know what was going on. Mother reported that Father had been told he was not to sleep in the same bed with E.H. In a July 2, 2019 forensic interview, E.H. described how Father pulled her pants down but denied Father touched her inappropriately. E.H. also said that, three years earlier, when E.H. and Father were in the shower together, Father touched E.H.'s "private parts" and had E.H. touch his private parts, but E.H. did not recall "any details" about the incident. E.H. said she tried to forget about the incident because she felt responsible for it and reported "feeling scared and having nightmares." E.H. said Mother remembered what E.H. said about the incident when it occurred in 2016.

Father claimed Mother had been "coaching" E.H. to make false sexual abuse allegations against Father "for years." Regarding pulling down E.H.'s pants, Father explained he saw bruising above and below E.H.'s "butt crack," asked E.H how she got the bruises, and E.H. said she fell down at school. Father denied sleeping in the same bed with E.H.; he said he had not slept in the same bed with E.H. since he had been told not to, years earlier. DPSS closed the June 14, 2019 referral as unfounded for general neglect and inconclusive for sexual abuse.

C. *Additional Evidence*

On May 11, 2023, E.H. participated in a second forensic interview, following her April 28, 2023 forensic interview, and after E.H. told a friend at school that Father was inappropriately touching E.H. In the May 11 interview, E.H. said Father had "bothered her in the past." E.H. recounted that, when she was three years old, Father would "take her in the shower with him, naked, and would make her wash him and 'suck on' " his penis. This occurred at the home of E.H.'s paternal grandparents, and Father "locked the door." E.H. said the " 'same thing' " happened, " 'probably more than one time,' " when E.H. was six years old. E.H. said she could remember the showering incidents because Mother reminded her that she told Mother about them when she was three and six years old.

Another time, when E.H. was nine years old, E.H. and Father were sleeping in the same bed, and Father began pulling E.H.'s pants and underwear down but pulled them up when E.H. awoke. E.H. then disclosed that Father had touched her " 'a couple of months' " before the May 11, 2023 interview "between her legs, on her hips, and on her 'boobs.' " Father touched E.H.'s hips and thighs at Father's home, while E.H. and Father were sitting on the couch, fully clothed. A few days later, Father took E.H.'s shirt and bra off, rubbed ointment on her chest, and rubbed it " 'really slowly' " on her " 'boobs.' "

When asked why she did not make these disclosures during her April 28, 2023 forensic interview, E.H. explained she was visiting Father at the time, and she was afraid Father would "do 'something,' " but she did not know what Father would do. E.H. said she would "feel scared" if she saw Father again, she did not want to see Father or talk to

11

him on the phone, and she wanted to stay with Mother. E.H. denied that Mother or anyone told her what to say. On May 21, 2023, E.H. was taken to a hospital. The next day, E.H. told a social worker she had a " 'rush of memories' " of what Father had done to her, which became unbearable, so she cut herself and had to go to the hospital.

On June 7, 2023, Father agreed to be interviewed and denied sexually abusing E.H. or touching E.H. inappropriately, at any time. Father said he pulled E.H.'s pants down "slightly" because he saw bruising above her pant line, and he wanted to see how severe the bruises were, but he did not do anything else. E.H. did not recall having a bruise. Father also claimed Mother had been falsely accusing Father of sexually abusing E.H. for 12 years.

In a June 15, 2023 addendum report, DPSS expressed concern that Father did not "see how his behaviors negatively affect[ed]" E.H.; Father believed he did not need and could not benefit from services; and everything that had happened with E.H. was due to Mother's "putting undue pressure" on E.H. DPSS recommended the court declare E.H. a dependent, order family maintenance services for Mother, and order reunification services for Father.

On June 19, 2023, E.H. told her therapist she would not "have the will to live" if she were "forced to move back" with Father, and she did not want to visit or talk to Father. On June 26, Father enrolled in therapy. Mother was also in therapy and looking for a parenting education referral.

On July 10, 2023, a social worker spoke with Father about the need to collect E.H.'s items from Father's home. That day, Father gave the social worker a large clear

12

plastic bag full of E.H.'s belongings E.H. had requested, including clothes, board games, and art supplies. When the social worker delivered the items to E.H., the social worker asked E.H. how she was doing, and E.H. said she was "still having some difficulties as she was experiencing nightmares [about] what she had experienced" when she was with Father. That evening, Mother texted the social worker, reporting some items Father sent in the bag with E.H.'s belongings had " 'triggered' " E.H. The bag included two notes to E.H. from Father; one note stated, " '[E.H.] will need the rest of her belongings when she returns home. These will be sufficient for this temporary situation, XOXO.' " This note was found tucked under E.H.'s trumpet in the trumpet case. The other note was written on a Valentine's Day card that E.H. had received from her grandparents, and stated, " 'always tell the truth and God will punish those who lie.' "

On August 1, 2023, E.H. reported that the note on the Valentine's Day card was in Father's handwriting and was not on the card when E.H. received it from her grandparents. The bag with E.H.'s belongings also contained the pajamas E.H. was wearing when she was nine years old and Father pulled her pants down. E.H. wondered why Father would send the pajamas, which no longer fit her. When she saw the pajamas, E.H. had a " 'panic attack' " and needed an emergency therapy session to calm down.

When visiting a cousin on July 29, 2023, E.H. saw videos Father had posted on social media, showing things E.H. would miss, including her guinea pigs and mutual

friends she had with Father. The videos made E.H. angry because Father had never posted videos before, and E.H. felt the videos were directed at her.[3]

E.H. told her therapist she cut herself on May 21, 2023 due to " 'a flood of intrusive thoughts and flashbacks of her abuse from her father.' " E.H. also said Father would not let E.H. mention " 'anything "weird," ' " and E.H. believed the sexual abuse felt " 'normal' " when it was happening, but it was not normal. E.H. had nightmares of Father " 'forcing her' " to orally copulate him. E.H. gave a "detailed timeline" of Father's sexual abuse of her from the time she was three years old to November 2022, the last time Father rubbed ointment on her breasts.

In July 2023, Father was meeting regularly with his therapist and believed it was helpful because it allowed him to "vent" about the case and calm his frustration for being falsely accused of sexually abusing E.H. Father told the social worker he felt " 'mistreated by the system' " and put in " 'double jeopardy' " because the sexual abuse accusations had been litigated, and the evidence that exonerated him was not being allowed because it was " 'too old.' " Father said he did not blame Mother or E.H. for the

---

[3] The social worker reviewed the videos and screenshots Father had posted on social media. One video showed Father and E.H. lip synching to a song, with the caption "Inseparable Daddy-daughter duo . . . ." Another video showed a split screen, with E.H. lip-synching a song, with Father moving Father's head to watch E.H. Father also posted a video showing DPSS and law enforcement officers at Father's house taking E.H. into protective custody, with the caption, " 'Hold your kids close. Be the lion at the door. There's people in this world that will do anything to rip [our] kids away. Even lie. Truth, God and patience wins every time' " and, " 'Nothing can defeat a father's love.' " Other posts included similar comments, including " 'God sees all lies and all lies will be revealed . . . .' " Another video showed Father in front of a sign that read, "Each year, upwards of 3.6 million reported incidents of child abuse are investigated in America. But every year, more than 2.8 million of those reports prove false."

allegations, and he was looking forward to his parenting program because it would be about teenagers. Father's therapist opined Father would not benefit from therapy because he was in " 'constant denial' " about having done anything inappropriate with E.H., he did not understand his boundaries with E.H., and he was "focused on other church members making false allegations against him."

On July 14, 2023, DPSS filed an amended petition, alleging jurisdiction over E.H., pursuant to section 300, subdivisions (b)(1) and (d), based on the following: "While in the care and custody of the father, the child, [E.H.], has suffered ongoing sexual abuse by [Father], in that [Father] sleeps with the child, he has pulled her pants and underwear down and has asked her to not disclose that they share a bed. An RCAT [Riverside County Assessment Team] interview was completed on April 28, 2023, in which [E.H.] disclosed she will sit on her father's knee, he will then pull her back towards him with his arms around her stomach. During a second RCAT interview on May 11, 2023, [E.H.] disclosed that a couple of months ago the father touched her between her legs, on her hips and on her breast. In addition, [E.H.] described the father's hands rubbing her thigh over her clothes. A few days later, the father took her shirt and bra off and rubbed" an ointment over E.H.'s "breasts very slowly and then on her neck."

D. *Jurisdiction and Disposition*

Following pretrial proceedings, the contested jurisdiction and disposition hearing was held on August 24 and October 4, 2023. The court admitted into evidence the reports that DPSS filed in the case: the May 3, 2023 detention report; the May 26 jurisdiction and disposition report; and the June 12, June 27, and August 15 addendum

15

reports.  Two witnesses testified:  E.H. and the social worker who began working on the case on May 26, 2023.

At the conclusion of the hearing, the court sustained the allegations of the amended petition and found E.H. was described in section 300, subdivisions (b)(1) and (d)(1).  The court removed E.H. from Father's care (§ 361, subd. (c)), ordered family maintenance services for Mother and reunification services for Father, and found visits with Father would be detrimental to E.H.  Father appeals from the October 4, 2023 dispositional orders.

## III.  DISCUSSION

A.  *Substantial Evidence Supports the Court's Jurisdictional Findings*

Father claims insufficient evidence supports the court's jurisdictional findings under section 300, subdivisions (b)(1) and (d); thus, Father argues the court abused its discretion in sustaining the allegations of the amended petition and declaring E.H. a dependent.  We conclude substantial evidence supports the court's jurisdictional findings and assumption of jurisdiction.

1. <u>Legal Principles</u>

At the jurisdictional hearing, the court determines whether the child is described in any of the categories specified in section 300, and therefore comes under the juvenile court's jurisdiction.  (*In re Veronica G.* (2007) 157 Cal.App.4th 179, 185; see § 355, subd. (a).)  The petitioner has the burden of proving by a preponderance of the evidence that the child is described in section 300.  (*In re Veronica G.*, at p. 185.)

16

A child comes within the jurisdiction of the court under section 300, subdivision (b)(1), if "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness as a result of . . . [¶] (A) The failure or inability of the child's parent . . . to adequately . . . protect the child." A child comes within the jurisdiction of the juvenile court under section 300, subdivision (d), if the "child has been sexually abused, or there is a substantial risk that the child will be sexually abused, as defined in Section 11165.1 of the Penal Code, by the child's parent . . . ."

Penal Code section 11165.1 provides that " 'sexual abuse' means sexual assault or sexual exploitation," and defines sexual assault as conduct in violation of one or more of several statutes, including section 288 (lewd or lascivious acts upon a child) and former section 288a (oral copulation). (Pen. Code § 11165.1, subd. (a).) " '[S]exual assault' " includes "[t]he intentional touching of the genitals or intimate parts, including the breasts, genital area, groin, inner thighs, and buttocks, or the clothing covering them, of a child, or of the perpetrator by a child, for purposes of sexual arousal or gratification . . . ." (*Id.* at subd. (b)(4); see *In re L.O.* (2021) 67 Cal.App.5th 227, 241-242.)

We review a juvenile court's jurisdictional findings for substantial evidence. (*In re Veronica G.*, *supra*, 157 Cal.App.4th at p. 185.) That is, " '[i]n reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and

17

credibility are the province of the trial court." [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court. [Citations.] ' "[We] must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence[—that is, evidence which is reasonable, credible, and of solid value—]such that a reasonable trier of fact could find [the jurisdictional allegations true based on a preponderance of the evidence]." ' " ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773; see *Veronica G.*, at p. 185.)

2. Analysis

As indicated, the amended petition alleged juvenile court jurisdiction over E.H. pursuant subdivision (b)(1) and (d) of section 300, based on Father's "ongoing sexual abuse" of E.H., in four respects: (1) Father "sleeps with the child, he has pulled her pants and underwear down and has asked her to not disclose that they share a bed," (2) in her April 28, 2023 RCAT interview, E.H. "disclosed she will sit on her father's knee, he will then pull her back towards him with his arms around her stomach," (3) in her May 11, 2023 RCAT interview, E.H. disclosed that, "a couple of months" earlier, Father "touched her between her legs, on her hips and on her breast" over her clothes," and (4) "[a] few days later" Father "took her shirt and bra off and rubbed" ointment over her "breasts very slowly and then on her neck."

The court sustained the allegations and found E.H. was described in subdivisions (b)(1) and (d) of section 300. Substantial evidence, namely, E.H.'s statements made in and after April 2023, and E.H.'s testimony at the August 24, 2023 hearing, support the

18

court's jurisdictional findings and assumption of jurisdiction under section 300, subdivisions (b)(1) and (d). In her April 27, 2023 police interview, and in her April 28 and May 11, 2023 forensic interviews, E.H. disclosed that one time, when she was nine year old, she and Father were sleeping the same bed, and Father began pulling her pants and underwear down but pulled them up when she awoke. Father claimed he saw bruising near E.H.'s pant line, but E.H. did not recall having a bruise. In her initial April 26 interview with a social worker, and in her April 28 forensic interview, E.H. also said Father told E.H. not to tell Mother that E.H. and Father were sleeping in the same bed.

Also in her April 28, 2023 forensic interview, E.H. disclosed she would sit on Father's knee, and Father would pull E.H.'s back towards him with his arms around her stomach. In her May 11 forensic interview, E.H. disclosed that, a couple of months earlier, Father touched her "between her legs, on her hips, and on her 'boobs' " over her clothes, and a "few days later" "took her shirt and bra off" and rubbed ointment over her breasts very slowly and then on her neck.

At the jurisdiction hearing, E.H. testified to additional details about some of Father's alleged sexual abuse. For example, E.H. testified Father put ointment on her chest when she was eight years old and "starting growing boobs;" before that time, Father would put the ointment only on E.H.'s upper chest and neck—above her breasts. E.H. began wearing a bra when she was in second or third grade, and Father would "reach under" her bra and put the ointment on her breasts.

As noted, a child is subject to juvenile court jurisdiction under subdivision (d) of section 300, if "the child has been sexually abused, or there is a substantial risk that the

19

child will be sexually abused . . . ." (Welf. & Inst. Code, § 300, subd. (d).) " 'Sexual abuse' " includes "sexual assault" which in turn includes "conduct in violation of" Penal Code section 288, subdivision (a). (Pen. Code, § 11165.1, subd. (a).) A person violates Penal Code section 288, subdivision (a) if the person "willfully and lewdly commits any lewd or lascivious act . . . upon or with the body . . . of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child . . . ." (Pen. Code, § 288, subd. (a).)

E.H.'s 2023 statements and testimony showed Father "willfully and lewdly" touched E.H.'s body, with the intention of arousing or gratifying Father's sexual desires, in the four the ways described in the amended petition. (Pen. Code, §§ 288, subd. (a), 11165.1; Welf & Inst. Code, § 300, subd. (d).) Indeed, the court found that, "[b]ased upon the testimony [of the child] alone, it is evident to the court that this is more than just simple touching or affection, that it was intended to arouse or gratify the sexual desires of the father." We agree. Thus, substantial evidence supports the court's jurisdictional findings and assumption of jurisdiction under Welfare and Institutions Code section 300, subdivision (d).

Substantial evidence also supports the court's assumption of jurisdiction under section 300, subdivision (b)(1) in that E.H. had suffered, and there was a substantial risk that E.H. would continue to suffer "serious physical harm" in the form of sexual abuse by Father. (§ 300, subd. (b)(1).) As the court noted, Father indicated to the social worker and his therapist that he was "refusing to stop this behavior" because he saw nothing wrong with it, and Father had taken "coercive actions" the court deemed "intimidating."

20

These coercive actions included Father's social media posts described in the DPSS reports, and Father's note to E.H., saying, " ' God will punish those who lie.' " As the court said, Father's intimidating actions toward E.H., after E.H. was removed from Father's care, show there "continue[d] to be a substantial risk" Father would sexually abuse E.H. (See *ibid.*)

Father argues it was "patently unreasonable for any trier of fact to find" the jurisdictional allegations true "based upon the complete record in this case." We disagree. A reasonable trier of fact could have found the allegations true based on the entire record, including E.H.'s statements in and after April 2023 and E.H.'s August 24, 2023 testimony at the jurisdiction and disposition hearing. Although E.H. denied that Father ever touched her inappropriately when she was first interviewed in April 2023, E.H.'s subsequent statements and testimony showed that Father sexually abused E.H. in the ways alleged in the amended petition.

Father claims E.H.'s statements and testimony are "inconsistent, fantastical and irreconcilable." Again, we disagree. E.H.'s testimony and prior statements about Father's actions were consistent and not "fantastical," if by fantastical Father means physically impossible or inherently improbable. (See *DePirro v. Bondo Corp.* (2007) 153 Cal.App.4th 150, 195 [appellate court may reject witness testimony credited by the trier of fact only if the testimony was physically impossible or inherently improbable].) The record shows, and the court reasonably could have concluded, that E.H. did not initially realize, in April 2023, that Father's touching was inappropriate, but E.H. later realized the touching had been inappropriate. The court had the opportunity to hear

21

E.H.'s testimony and review the evidence of record. Having done so, the court found E.H.'s testimony credible. Credibility determinations are the province of the trier of fact. We discern no error warranting reversal.

B. *Substantial Evidence Supports the Order Removing E.H. from Father's Custody*

Father next claims the court abused its discretion in ordering E.H. removed from Father's custody. We conclude substantial evidence supports the removal order. As relevant, section 361, subdivision (c), provides that a juvenile court may not remove a child from the care and custody of the child's parent, with whom the child was residing when a section 300 petition was initiated, unless the court finds clear and convincing evidence that one or more of several circumstances are present, including "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c).)

"The 'clear and convincing' standard specified in section 361, subdivision (c), governs the trial court but it is not the standard for appellate review." (*In re A.R.* (2015) 235 Cal.App.4th 1102, 1115.) On appeal, we review an order removing a child from parental custody for substantial evidence. (*Ibid.*) " 'A removal order is proper if it is based on proof of . . . a potential detriment to the minor if he or she remains with the parent . . . . The focus of the statute is on averting harm to the child.' " (*In re Miguel C.* (2011) 198 Cal.App.4th 965, 969.)

Here, substantial evidence shows E.H. would have suffered detriment had she not been ordered removed from Father's custody. First, Father's sexual abuse of E.H. was likely to continue if E.H. was returned to Father. Father denied he had ever touched E.H. inappropriately, and told his therapist, "if he wants to 'cuddle his daughter, he is going to cuddle her.'" Second, E.H. told her therapist she would not "have the will to live" if she were "forced to move back" with Father. E.H. had been "experiencing nightmares as to what she had experienced when she was with" Father. E.H.'s therapist did not recommend that E.H. even visit Father, much less be returned to Father, given E.H.'s fear that Father would continue to sexually abuse her.

Father claims the court abused its discretion in "proceed[ing] to disposition" and ordering E.H. removed from Father because insufficient evidence showed that any of the *jurisdictional allegations* were true. As explained, however, substantial evidence supports the courts jurisdictional findings *and* the order removing E.H. from Father. Thus, we uphold the jurisdictional findings and the removal order.

C. *Father Was Not Denied Due Process at the Jurisdiction and Disposition Hearing*

Father claims the court deprived Father of his due process rights at the jurisdiction and disposition hearing in refusing (1) to admit reports to the family court, in 2015, by Dr. Robert L. Suiter and Dr. Sherrie D. Webb, and to allow Drs. Suiter and Webb to testify; (2) to admit evidence of Mother's "extensive history" of falsely accusing Father of sexually abusing E.H., and E.H.'s history of being unduly influenced by Mother; and (3) to allow Father to "meaningfully" cross-examine witnesses. We find no merit to Father's due process claims.

23

1. Relevant Background

Before the jurisdiction and disposition hearing, Father filed evidentiary objections to the hearsay portions of DPSS's May 4 detention report, May 26 jurisdiction and disposition report, and June 1, June 27, and August 25 addendum reports. Father also filed an exhibit list of 15 items of evidence Father proposed to adduce at the hearing, and a witness list. E.H., Mother, and DPSS filed objections to 10 of Father's 15 exhibits, and to several of Father's witnesses, on relevancy and other grounds.

At a pretrial hearing on July 14, 2023, the court ruled on the objections to Father's proposed exhibits and witnesses. The court admitted the unopposed exhibits: the February 17, 2023 family court judgment, granting the parents joint custody of E.H. and establishing a timeshare schedule, E.H.'s April 28 and May 11 forensic (RCAT) interviews, and an August 30, 2019 Family Code section 3027(b) report.

The court excluded Father's other exhibits, principally on relevancy grounds. These included Dr. Suiter's November 21, 2015 Evidence Code section 730 report; Dr. Webb's August 24, 2015 report on seven visits she observed between Father and E.H. in July and August 2015; a February 4, 2020 family court custody order; reporter's transcripts of family court proceedings on August 10, 2016, October 1, 2019, and March 10, 2021; and a November 12, 2014 San Bernardino County Sheriff's Department report, which determined that sexual abuse allegations against Father were unfounded.

Father's counsel argued the excluded exhibits were relevant to show that Mother had a history of falsely accusing Father of sexually abusing E.H., and of "manipulating" E.H. to falsely accuse Father, and that the allegations had never been substantiated. But

24

the court ruled that the older reports and family court records were "stale" and irrelevant to "the current allegations." The court emphasized it did not "want us spinning our wheels and going off the rails on things that have nothing to do with the current allegations. I want . . . to be very clear. We're focused on the current allegations."

Father also sought to adduce the entire court files in three family law cases. The court said it would consider records from the files "for rebuttal purposes only" "if in the course of testimony" a dispute arose and Father could identify a record that was relevant to rebut the testimony. But, the court said, "the wholesale usage" of "three different sets of court records" was "a little over the top" given that "we are going to try very hard to limit this case only to the current allegations." The court also allowed Father to use two "investigative narrative[s]" prepared by DPSS, one detailing the family's DPSS history from September 16, 2012 to October 17, 2012, and the second from January 25, 2011 to August 8, 2019.

Turning to Father's seven proposed witnesses, the court ruled that five of the witnesses could testify: Mother, Father, E.H., and the two DPSS social workers who had worked in the current case for E.H. Father was also allowed to call the interviewer who conducted the April 28, 2023 and May 11, 2023 RCAT interviews, but solely for the purpose of ascertaining the interviewer's background and qualifications. The court excluded Dr. Suiter's testimony as irrelevant, because Dr. Suiter had not seen E.H. since 2015, and because the court was excluding Dr. Suiter's 2015 Evidence Code section 730 evaluation and report as "stale" and irrelevant to the current allegations.

Dr. Suiter's November 21, 2015 report was a psychological assessment of Mother, Father, and E.H., prepared for the family court pursuant to Evidence Code section 730. The report discussed Mother's sexual abuse allegations against Father up to the time of the report, including that Father was showering with E.H. and taking nude photos of E.H. The report noted DPSS had investigated the prior sexual abuse allegations and concluded they were unfounded.

Dr. Suiter's report also noted that the results of an "objective measure specific to sexually deviant thoughts and behaviors" *did not* reflect that Father had a sexual interest in children or adolescents, or that Father had "engaged in any type of sexually deviant behavior." Both parents were "warm, caring, and nurturing" toward E.H. E.H. denied any concerns about either parent. E.H. told Dr. Suiter that Father had showered with E.H. before, but Father always wore swimming trunks, and E.H. denied Father or anyone else had taken nude photos of E.H. Dr. Suiter's report noted that E.H.'s account of showering with Father while Father wore swimming trunks was consistent with the report E.H gave to DPSS, and whether Father took nude photographs of E.H. could not be "ruled out" but could "only be considered inconclusive." The report also noted that E.H. was "enthusiastic" in describing Father and, in Dr. Suiter's presence, E.H. "displayed no hesitancy with [Father] in any manner as she was even quite noticeably excited to see [Father]."

In conclusion, Dr. Suiter opined that Father did not pose "any meaningful risk of harm to [E.H.]," and did not have "any sexual interest in children" or "any limitations in terms of boundaries" Although it was "inappropriate" for Father to shower with E.H, and

26

"clear" that Father needed to "refrain from showering" with E.H. "regardless of any attire he is clothed with," there was "an inadequate basis to limit" Father's time with E.H.  Dr. Suiter recommended the parents share joint legal and physical custody of E.H., and "in the event of any additional allegations made regarding any form of mistreatment" of E.H., that Dr. Suiter see the family again in order to evaluate the new allegations.

Father's counsel argued that Dr. Suiter's report was "very thorough" and addressed "allegations mentioned in" the jurisdiction and disposition report, namely, the showering and nude photograph allegations.  Father's counsel emphasized that the current DPSS reports offered "this lengthy history that goes back to when the child was two, three years old, we're taken through the same steps in the forensic interviews, which are conducted with the report, and now [DPSS] wishes to sort of excise a good portion of [its] jurisdiction/disposition report."  Counsel claimed it was "imperative and necessary" that the court consider the "professional information" in Dr. Suiter's report, and proposed to call Dr. Suiter to lay the foundation for and authenticate the 2015 report.

The court asked county counsel to explain DPSS's "position generally" on Father's presenting evidence concerning the "lengthy history" of sexual abuse allegations outlined in the DPSS reports.  County counsel said the "prior legal history, prior CFS history" in the DPSS reports was not being offered to prove "the current allegations." Instead, the current allegations were based on E.H.'s "recent disclosure of sexual abuse," DPSS was offering E.H.'s recent "statements and the investigation pertaining to those statements" to support the current allegations, and Dr. Suiter's report "from eight years ago" was not relevant to prove the current allegations.  Counsel for E.H. added that Dr.

27

Suiter had evaluated E.H.'s early disclosures about "some incidents in the shower," which were as not part of the current allegations. Also, E.H. was five years old when Dr. Suiter evaluated the family in 2015, and E.H. was now age 13. Thus, Dr. Suiter's report was "very stale." The court agreed and excluded Dr. Suiter's report as irrelevant and unduly time consuming, given that "so much ha[d] transpired" since Dr. Suiter evaluated the family in 2015. E.H. was five years old when Dr. Suiter's report was prepared in 2015, and the report did not concern the current allegations, which were based on reports of Father's more recent sexual abuse of E.H., alleged in the amended petition. The court also noted that the report contained hearsay (Evid. Code, § 1200) and was unauthenticated. (Evid. Code, §§ 1400, 1401.)

Dr. Webb's report stated that Dr. Webb supervised *seven one-hour visits* between Father and E.H., between July 11 and August 25, 2015. Dr. Webb noted in the report that E.H would greet Father by giving him a hug, and E.H. was "excited to share a toy that she has brought" or tell Father about her recent activities. Father told E.H. he loved her, and Father was "funny and adept at making the child laugh while reading books and playing with dolls."

Dr. Webb's report also noted that E.H. told Father he was "not to engage in certain behaviors." On July 11, 2015, E.H. told Father, " 'I don't need to wash your private parts. You're a big boy. You need to wash your own private parts.' " " 'I just want you to be nice. Girls don't see boys' private parts and boys don't look at girls' private parts.' " On July 18, E.H. said, " 'My mommy wants me to tell you everything you did. I forgot last time. I'm supposed to tell you every time I see you. Girls and boys don't touch each

28

other's private parts.  I want you to remember what I say.' "  On August 15, E.H. said, " 'You only take pictures with clothes on, not naked.  I have to tell you that.  Don't do bad things.  When you take me to Disneyland, that's good.' "  Father sought to admit Dr. Webb's report, but Father did not propose to call Dr. Webb to testify.

Counsel for Father argued Dr. Webb's report reflected the family's "dynamics," and supported Father's claim that the sexual abuse allegations had "historically" been "unfounded."  Father did not propose to call Dr. Webb to testify.  Counsel for E.H., Mother, and DPSS argued Dr. Webb's report was irrelevant and would be unduly time consuming because the visits Dr. Webb observed occurred in 2015, and her report did not concern the current allegations.  Counsel also objected that the statements in the Dr. Webb's report were hearsay and the report lacked authentication.  As with Dr. Suiter's report, the court concluded Dr Webb's report was irrelevant because it was from 2015, and the current allegations against Father were not "from that time frame."

E.H. testified at the jurisdiction and disposition hearing on August 24, 2023.  The hearing was continued, and on October 4, the court ruled on Father's evidentiary objections to the hearsay statements in the DPSS reports.  First, the court overruled Father's hearsay objections to statements by the reporting party who made the April 25, 2023 report describing how Father and E.H. would sit together in church, given that the reporting party had to remain anonymous and the social worker who spoke with the party was available to testify about the worker's conversation with the party.  (See § 355.)

The court also overruled Father' objections to hearsay statements E.H. made to her therapist, and that the therapist made to the social worker, according to the DPSS reports.

29

The court reasoned that E.H. and the social worker were available to testify, and the therapist was not on Father's witness list. Thus, Father could cross-examine E.H. and the social worker about their conversations with the therapist. The court overruled Father's other evidentiary objections on similar grounds: either the declarant, E.H., or the social workers who spoke with E.H. were available to testify about the hearsay statements by E.H. in the DPSS reports. Father withdrew his objections to E.H.'s hearsay statements to the social worker about Father's social media posts and the items Father sent to E.H. that triggered E.H., given that Father intended to call that social worker to testify.

Next, Father called the social worker who began working on the case on May 26, 2023 to testify. This social worker was not present for E.H.'s April 28 and May 11, 2023 forensic (RCAT) interviews, and was not present when E.H. testified on August 24, 2023. The worker recommended the court sustain the amended petition based on E.H.'s statements in her April and May RCAT interviews. No other witnesses testified. The court admitted the DPSS reports into evidence. At the conclusion of the hearing, the court sustained the allegations of the amended petition (§ 300, subds. (b)(1), (d)), declared E.H. a dependent, ordered E.H. removed from Father's care, and found visits with Father would be detrimental to E.H.

2. Legal Principles

Parenting is a fundamental right, and its "impairment requires strict adherence to procedural due process." (*In re Crystal J.* (1993) 12 Cal.App.4th 407, 412.) Procedural due process "is not absolute"; if a due process right exists, courts must balance several factors to decide what process is due. (*In re Vanessa M.* (2006) 138 Cal.App.4th 1121,

30

1129.)  In the context of a jurisdiction and disposition hearing, a parent's due process rights include the right to be heard, adduce witness testimony, and cross-examine witnesses.  (See *In re Armando L.* (2016) 1 Cal.App.5th 606, 620.)  In determining the extent of these rights, the court must balance the parent's desire to retain custody of their child and counter the allegations of the petition "against the government's s goal of serving [the child's] best interests by resolving dependency matters expeditiously and allowing the juvenile court wide latitude to control dependency proceedings."  (*In re Vanessa M.*, at pp. 1129-1130.)  "[T]he Constitution permits judges 'to exclude evidence that is "repetitive . . . , only marginally relevant," or poses an undue risk of "harassment, prejudice, [or] confusion of the issues." ' "  (*Holmes v. South Carolina* (2006) 547 U.S. 319, 326-327.)

Under Evidence Code section 352, a trial court has broad discretion to exclude repetitive or marginally relevant evidence—that is, evidence whose probative value is substantially outweighed by the probability its admission would necessitate an undue consumption of court time or confuse the issues.  (*People v. Castaneda-Prado* (2023) 94 Cal.App.5th 1260, 1284.)  We review a trial court's rulings on the admission or exclusion of evidence under Evidence Code section 352 for an abuse of discretion.  (*People v. Jimenez* (2019) 35 Cal.App.5th 373, 389.)

A trial court abuses its discretion when it rules in an "arbitrary , capricious, or patently absurd manner," resulting in a "miscarriage of justice."  (*People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)  But "[w]hen a trial court exercises its discretion to exclude evidence and does not abuse that discretion, the exclusion of the evidence. . . does not

31

impermissibly infringe on [the proponent's] federal constitutional rights." (*People v. Shorts* (2017) 9 Cal.App.5th 350, 358-359.)

3. Analysis

As stated, Father claims the court violated Father's procedural due process rights in refusing (1) to admit Dr. Suiter's and Dr. Webb's 2015 reports into evidence, and allow the doctors to testify; (2) to admit evidence of Mother's "extensive history" of falsely accusing Father of sexually abusing E.H., and of unduly influencing E.H to falsely accuse Father; and (3) to allow Father to introduce exculpatory evidence and "meaningfully" cross-examine witnesses. These claims are unavailing, for several reasons.

First, DPSS argues, and we agree, that Father has forfeited his due process claims because he does not support the claims with reasoned argument and citations to authority. When an appellant asserts a point but fails to support it with " 'reasoned argument and citations to authority,' " the point may be deemed forfeited. (*Coziahr v. Otay Water Dist.* (2024) 103 Cal.App.5th 785, 799; *Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785.) In his opening brief, Father merely asserts, without reasoned argument or analysis, that "the trial court wrongfully refused to consider Dr. Suiter and Dr. Webb as witnesses and their reports." Father points out that Dr. Suiter performed an Evidence Code section 730 evaluation of the family, "tested the Father to see if he has a sexual interest in children," and "evaluated the Mother and her history of making false sexual abuse allegations." Father then argues "[t]his evidence was clearly relevant and probative of the issue of whether this child has been coached, unduly influenced or

32

intimidated into making false sexual abuse allegations against the Father." But Father does not explain, or cite authority to support the proposition, that the exclusion of Dr. Suiter's 2015 report and testimony was an abuse of the court's discretion or violated Father's due process rights.

Father's second and third due process claims are similarly unsupported. Father asserts: "Secondly the extensive history of false sexual abuse allegations by the Mother," and E.H.'s history of being "unduly influenced and intimidated" by Mother to make false sexual abuse allegations, "was relevant and probative to the contested jurisdiction in this case. . . . [¶] Thirdly, the trial court wrongfully limited the Father's attorney at trial from trying to introduce exculpatory evidence and meaningfully cross-examine witnesses." But Father does not identify the historical or exculpatory evidence Father was not allowed to present or what witnesses Father was unable to meaningfully cross examine. Thus, we deem Father's due process claims unsupported and therefore forfeited.

Even if Father's due process claims are not forfeited, they lack merit. The court did not abuse its discretion in concluding that Father's proffered evidence concerning the history of the sexual abuse allegations against Father from 2011 to 2019, including the 2015 reports and any testimony from Drs. Suiter and Webb, were irrelevant to the current sexual abuse allegations, and would be unduly time consuming in light of their minimal probative value. (Evid. Code, §§ 210, 352.) All of the excluded evidence was largely repetitive of the historical evidence in the current DPSS reports filed between May and August 2023.

The current DPSS reports summarized the history of the sexual abuse allegations against Father, from 2011 to 2019, including the 2015 reports from Drs. Suiter and Webb. The current DPSS reports also showed that the prior sexual abuse allegations had never been substantiated by the family court, DPSS, or law enforcement investigators. As the juvenile court noted, Drs. Suiter and Webb had not seen E.H. since 2015, when E.H. was five years old; thus, their testimony would have had little to no bearing on the truth of the current sexual abuse allegations against Father, which began in 2011, when E.H. was nine years old, and continued through April 2023.

In addition, the court allowed Father ample opportunities to rebut the evidence in the DPSS reports, but Father did not utilize these opportunities. For example, the court ruled Father could call Drs. Suiter and Webb to testify if they re-examined E.H., but Father did not have them re-examine E.H. The court also ruled that Mother and Father could testify about the past sexual abuse allegations, and that Father could use the family court records as rebuttal evidence. But Father chose not to testify, did not call Mother to testify, and did not proffer any rebuttal evidence. The court also ruled that Father could utilize the DPSS-prepared investigative narratives, which detailed the family's history from 2011 to 2019, and the Family Code section 3027(b) report from 2019, but Father did not proffer any of this evidence at the hearing. In sum, Father has not shown the court abused its discretion or violated Father's due process rights in excluding any evidence at the jurisdiction and disposition hearing.

## IV.  DISPOSITION

The October 4, 2023 jurisdictional findings and dispositional orders are affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

FIELDS _____
J.

We concur:


CODRINGTON _____
Acting P. J.


RAPHAEL _____
J.